BERING STRAITS COASTAL MANAGE-
MENT PROGRAM; Native Village of
Koyuk, Appellants/Cross–Appellees,

v.

Harry NOAH, Commissioner, Ron Swan-
son, Director, Division of Land; Alaska
Department of Natural Resources;
Coastal Policy Council, Appellees/Cross–
Appellants.

Nos. S–7679, S–7699.

Supreme Court of Alaska.

Jan. 23, 1998.

Nancy S. Wainwright, Anchorage, for Appellants/Cross–Appellees.

Cameron M. Leonard, Assistant Attorney General, Fairbanks, for Appellee/Cross–Appellant Department of Natural Resources.

Steven C. Weaver, Assistant Attorney General, Juneau, for Appellee/Cross–Appellant Coastal Policy Council.

Bruce M. Botelho, Attorney General, Juneau, for Appellees/Cross–Appellants.

Before COMPTON, C.J., and MATTHEWS, EASTAUGH, FABE and BRYNER, JJ.

COMPTON, Chief Justice.

## I. INTRODUCTION

The Alaska Coastal Policy Council (Council) held that a proposed trapping cabin in the Timber Creek area of the Koyuk River drainage is consistent with the Alaska Coastal Management Program (ACMP) and the Bering Straits Coastal Management Plan (Bering Straits Plan).[1] The superior court, on an appeal pursuant to Alaska Appellate Rule 602, affirmed the Council's decision. The Bering Straits Coastal Management Program (Coastal District) appeals. The State cross-appeals the superior court's finding that the Council has jurisdiction to determine whether a permit application is consistent with the Northwest Area Plan (NWAP). We affirm the Council's decision that the proposed cabin is consistent with the Bering Straits Plan. Since the applicability of NWAP has no effect on the reasonableness of the Council's decision, we decline to determine

---

1. The appellants/cross-appellees are Bering Straits Coastal Management Program, a coastal resource district as defined by AS 46.40.210(2)(E) and consisting of the Bering Straits Coastal Resource Service Area (BSCRSA) and the Native Village of Koyuk (collectively Coastal District). The appellees/cross-appellants are Harry Noah, Commissioner, Ron Swanson, Director, Division of Land; Alaska Department of Natural Resources; Alaska Coastal Policy Council (collectively the State).

whether the Council has jurisdiction to apply NWAP.

## II.  *FACTS AND PROCEEDINGS*

### A.  *The Regulatory Framework*

Alaska Statute 46.40.010(a) provides that the Council "shall approve ... the Alaska coastal management program [ACMP]." The objectives of ACMP must be consistent with, *inter alia,*

> the use, management, restoration, and enhancement of the overall quality of the coastal environment; the development of industrial or commercial enterprises that are consistent with the social, cultural, historic, economic, and environmental interests of the people of the state; [and] the orderly, balanced utilization and protection of the resources of the coastal area consistent with sound conservation and sustained yield principles.

AS 46.40.020(1)–(3).  The statute states that "[c]oastal resource districts shall develop and adopt district coastal management programs in accordance with [its] provisions."  AS 46.40.030.  Once a local coastal district develops a management program, the Council must approve it before it becomes part of ACMP. AS 46.40.060(a).  All land-use permit applications must conform with any affected district coastal management programs (CMP) before being approved by a resource agency.  AS 46.40.100(a).

When a permit application for a project located in a coastal zone or which affects a coastal zone is submitted to a resource agency, either the agency or the Office of Management and Budget reviews the application for consistency with any affected CMP. *See* 6 Alaska Administrative Code (AAC) 50.190(14), 6 AAC 50.070, AS 46.40.096(b).  If only one resource agency's approval is needed, that agency becomes the coordinating agency for that application.  AS 46.40.096(b).

The coordinating agency provides public notice of the project and receives and analyzes comments from the public, other re-source agencies, and any affected coastal district(s).  6 AAC 50.070.  The coordinating agency "carefully" considers all comments and gives "due deference" to the comments of any affected coastal district(s).  *Id.* An affected coastal district is considered to be an expert on its own plan.  6 AAC 50.120(a).  If the coordinating agency rejects the recommendation of a coastal district, the agency must make written findings stating the reasons for the rejection.  6 AAC 50.120(a).  After concluding the consistency review described above, the coordinating agency writes a proposed "consistency determination." AS 46.40.040(6); 6 AAC 50.120(b).

After a coordinating agency's proposed consistency determination is circulated, "a resource agency, an affected coastal resource district with an approved program, or [an] applicant" may request elevation of review to "the division directors, and then commissioners of the resource agencies." [2]  6 AAC 50.070(j)-(k).  "If the review is elevated, the coordinating agency ... shall arrange meetings and shall mediate among the resource agencies, the affected coastal resource districts with approved programs, and the applicant, for the purpose of attempting to resolve any disputed issues and to formulate a mutually acceptable consistency determination." 6 AAC 50.070(k).  If no consensus is reached the coordinating agency must render a determination consistent with any policy directions given by the commissioner or the governor. *Id.*

If no consensus is reached after commissioner-level elevation, an "authorized party" may "file a petition showing that a district coastal management program is not being implemented, enforced, or complied with." AS 46.40.100(b).[3]  The Council "shall convene [for an adjudicatory hearing] ... to consider the matter."  AS 46.40.100(b).

### B.  *The Bering Straits Coastal Management Program*

The Bering Straits Coastal Resource Service Area (BSCRSA) was formed in 1980 by

---

**2.**  The resource agencies are the Alaska Department of Fish and Game, Alaska Department of Natural Resources, and Alaska Department of Environmental Conservation.

**3.**  The former version of AS 46.40.100 was in effect at the time of the Council hearing.  The current statute, effective August 7, 1994, also allows appeals to the Council.

local vote to delineate the boundaries of a coastal management district under ACMP. A BSCRSA Board was formed, also by local vote, to develop and adopt a program for the coastal management district.[4] After nine years of development, the BSCRSA's coastal management plan was approved by the Council and added to ACMP.

### C. *Procedural History*

Keith Koontz has trapped on the Seward Peninsula since 1980.[5] Koontz originally used a building known as the Camp Haven cabin, located in a valley adjacent to Timber Creek, as the base for his guiding and trapping operations. In 1989 the Bureau of Land Management advised Koontz that he must vacate the Camp Haven cabin because it was being restored as a historical site. Koontz continued to trap in the area between November and mid-February, using a tent camp. However, he found the tent camp "too cold and too risky in the event of an emergency."

Koontz filed a Trapping Cabin Construction Permit application with the Department of Natural Resources (DNR) in July 1990. He proposed to build a sixteen-foot by twenty-foot cabin, an outhouse, and a cache for storage. The cabin would be constructed of logs selectively taken from the area around the site so as not to create a clearing. The proposed sod roof would not be visible from the air. The cabin would be approximately six miles from the Camp Haven cabin, which would allow Koontz to use his old Camp Haven trapping lines.

DNR was the sole agency whose approval Koontz needed to build the cabin. DNR therefore served as the "coordinating agency" under ACMP. 6 AAC 50.030(b).

Coastal District commented that the proposed cabin was inconsistent with ACMP and the Bering Straits Plan. Coastal District therefore recommended that DNR deny the permit application on the grounds that a permanent cabin would violate the established custom and tradition of not building permanent structures in hunting and trapping grounds and that it would interfere with subsistence hunting and trapping in the area. Coastal District also noted that "local trappers were allowing furbearer populations to rebuild and that a cabin would interfere with that program." It emphasized that it was objecting to a permanent cabin, but did not object to Koontz's right to subsistence trap in the area.

After collecting all comments, DNR concluded that a permanent trapping cabin was consistent with both the Bering Straits Plan and ACMP. Coastal District elevated the review to the division director. As an alternative to a permanent cabin, Coastal District suggested that Koontz use a wall tent for

---

**4.** AS 46.40.030 lists the specific guidelines for programs:

(1) a delineation within the district of the boundaries of the coastal area subject to the district coastal management program;

(2) a statement, list, or definition of the land and water uses and activities subject to the district coastal management program;

(3) a statement of policies to be applied to the land and water uses subject to the district coastal management program;

(4) regulations, as appropriate, to be applied to the land and water uses subject to the district coastal management program;

(5) a description of the uses and activities which will be considered proper and the uses and activities which will be considered improper with respect to the land and water within the coastal area;

(6) a summary or statement of the policies which will be applied and the procedures which will be used to determine whether specific proposals for land or water uses or activities shall be allowed; and

(7) a designation of, and the policies which will be applied to the use of, areas within the coastal resource district which merit special attention.

**5.** The Department of Fish and Game Furbearer Sealing Records indicate that Koontz trapped three wolverines in Timber Creek preceding his permit application (in 1985, 1987, and 1990). The hearing officer heard testimony that Koontz's trapping had no adverse effects in the area. However, this testimony was presented by witnesses who had already stopped trapping in Timber Creek by 1985, the first recorded year of Koontz's trapping activities. Coastal District questions the validity of this expert testimony that Koontz will not negatively impact wildlife and subsistence use in the area. We conclude that the hearing officer had other substantial evidence that supported her decision that Koontz's trapping had no adverse effects in Timber Creek. *See* Discussion, *infra*, Part III.C.2.

shelter, or base his trapping activities in a local village. The director reversed DNR's finding that the permanent cabin was consistent with the Bering Straits Plan and ACMP, and denied Koontz a permit to build a permanent structure. The director adopted Coastal District's suggestion that Koontz use a wall tent as a base for his trapping activities.

Koontz elevated the review to the level of the DNR commissioner. He argued that a wall tent did not provide adequate safety for his trapping activities. The Division of Governmental Coordination wrote the commissioner's level review on behalf of the commissioner. The commissioner reversed the director's decision and approved the permit application to build a permanent trapping cabin. The commissioner's findings included the following: (1) the proposed cabin is not in an Important Use Area; (2) Koontz's trapping has not impacted wildlife nor interfered with activities of residents of surrounding villages; and (3) the proposed cabin would not negatively impact subsistence or traditional and customary uses in the area.

Coastal District petitioned the Council for a hearing, arguing that a trapping cabin violated NWAP and policies A–1, A–4, B–2, and K–3 of the Bering Straits Plan.[6] A hearing officer conducted an adjudicatory hearing and affirmed the commissioner's decision. The hearing officer found that the "[i]ssuance of a permit for the erection of the proposed Timber Creek cabin is consistent with [the Bering Straits Plan]." The hearing officer also concluded that the Council lacked jurisdiction to consider claims under NWAP, but

that the permit was consistent with NWAP in any event. The vote by the Council after the hearing was 7–1 in favor of the permit.

Coastal District appealed the Council's decision to the superior court pursuant to Appellate Rule 602. The superior court concluded that the Council's decision was supported by substantial evidence and had a reasonable basis and therefore upheld it. This appeal and cross-appeal followed.

## III. DISCUSSION

### A. Standard of Review

"No deference is given to the superior court's decision when it acts as an intermediate court of appeal." *Kuitsarak Corp. v. Swope*, 870 P.2d 387, 392 (Alaska 1994).

■ Our review of the Council's order is limited to determining whether it had a reasonable basis. We use the reasonable-basis standard for questions of law involving agency expertise. We recently summarized this standard in *Kuitsarak*:

In reviewing agency decisions involving complex subject matters or fundamental policy determinations, our role is to ensure that the agency has taken a hard look at the salient problems and has genuinely engaged in reasoned decision making. We review the agency decision only to the extent necessary to ascertain whether the decision has a reasonable basis, and to ensure that it was not arbitrary, capricious, or prompted by corruption. Where an agency fails to consider an important factor in making its decision, the decision will be regarded as arbitrary. We review

6. *A–1 Subsistence Use*
Subsistence use of the coastal lands and waters of the Bering Straits CRSA has traditionally been the primary and highest priority use of all lands and waters within the coastal management plan area; therefore, all other land/water uses and activities shall ensure that through careful planning, development, and operation of a resource extraction or development project, all steps will be taken to mitigate adverse impacts to subsistence resources and their use in accordance with Policy F–2.
*A–4 Impacts on Subsistence*
Within Important Use Areas identified for subsistence resources and activities in Chapter 4, entities proposing non-subsistence uses or activities shall locate such uses and activities at

alternative sites outside the identified areas. Where location in alternative sites is not feasible and prudent, uses and activities shall minimize adverse impacts to subsistence resources, subsistence activities, and coastal habitats.
*B–2 Habitat Maintenance*
All habitats shall be managed to maintain or enhance the biological, chemical, and physical characteristics of the habitat which contributes to its capacity to support living resources.
*K–3 State Land Disposals*
The Bering Straits CRSA will participate in the planning process for programmatic state land disposals in accordance with the authorities outlined in AS 38 ... 6 AAC 50, and other Department of Natural Resources procedures.

DNR's decision to issue [the requested permits] under the reasonable basis standard.

*Id.* (citations and quotations omitted).

■ We review an administrative agency's factual findings for substantial evidence. *See Handley v. State of Alaska, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Keiner v. City of Anchorage*, 378 P.2d 406, 411 (Alaska 1963)). We substitute our judgment for that of the agency only when it has interpreted the law in an area where it has no special expertise. *Id.*

B. *The Council Did Not Owe Coastal District's Consistency Comments Due Deference during a Hearing under AS 46.40.100(b).*

After DNR's proposed consistency determination was elevated to its highest level, Coastal District petitioned the Council for a hearing under former AS 46.40.100(b).[7] Before granting a hearing, the Council required that Coastal District make a prima facie showing that its coastal management program was not being "implemented, enforced, or complied with." AS 46.40.100(b). The Council conducted a pre-hearing conference and a five-day hearing and then requested post-hearing briefs.

7. This statute was amended in 1994 (§§ 3, 4, 5, 6 ch 34 SLA 1994). This petition was filed and reviewed under the prior statute. Former AS 46.40.100(b) provided:

> On petition of a coastal resource district, a citizen of the district, or a state agency, showing that a district coastal management program is not being implemented, enforced or complied with, the council shall convene a public hearing to consider the matter. A hearing called under this section shall be held in accordance with the Administrative Procedure Act (AS 44.62). After hearing the council may order that the coastal resource district or state agency take any action which the council considers necessary to implement, enforce or comply with the district coastal management program.

8. 6 AAC 50.120(a). Conclusive Consistency Determination.

■ The Council correctly determined that it is authorized to conduct this hearing *de novo* under AS 46.40.100(b). The Council reasoned that the public hearing "shall be held in accordance with the Administrative Procedure Act." AS 46.40.100(b) (amended 1994). The hearing officer concluded that "[s]ince the Administrative Procedure Act ... embodies procedures for the conduct of a *de novo* hearing rather than appellate review procedures ... the legislature must have intended that [the Council] apply these procedures and conduct its hearing *de novo*." She noted additionally that

> [t]he fact that the [Council]'s authority to conduct a hearing existed prior to and is independent of the "consistency review process" contained in 6 AAC 50 indicates that its authority is not limited to a deferential review of the decision-making which occurred during that process but, rather, that it has the authority to conduct a *de novo* hearing.

Coastal District contends that a *de novo* hearing denies it the deference required by 6 AAC 50.120. ACMP regulations specifically state that the coordinating agency, when making its consistency determination, must afford due deference to the comments of the affected coastal district. 6 AAC 50.120(a).[8] Coastal District argues that due deference at the comment level is meaningless unless it is also required at a Council hearing. It maintains that "[The Council] is charged with *reviewing* DNR's decision, [and] it therefore

> In rendering a conclusive consistency determination, the coordinating agency shall give careful consideration to all comments, and shall give due deference to the comments of resource agencies and affected coastal districts with approved programs. "Due deference" means that deference which is appropriate in the context of the commenter's expertise and area of responsibility, and all the evidence available to support any factual assertions. A coastal resource district whose district program has been incorporated into the ACMP is considered to have expertise in the interpretation and application of its program. If the coordinating agency rejects a stipulation or recommendation requested by a commenting resource agency or affected coastal resource district with an approved program, within its respective area of expertise, the coordinating agency shall make a written finding stating the reasons for rejecting the stipulation.

acts in a manner akin to that of a panel of judges reviewing agency action." Coastal District reasons that if the Council reviews the decision of the coordinating agency, it must afford the same deference as the coordinating agency.

We conclude that the Council hearing, authorized by AS 46.40.100(b), is not a review of the coordinating agency's decision.[9] A party who petitions the Council for a hearing must show that the district program is not being "implemented, enforced, or complied with." AS 46.40.100(b). This petition is wholly independent from the review by right available before the Council hearing. Due deference is required only of the coordinating agency when making a consistency determination. The Council properly conducted its hearing using a *de novo* standard of review.

C. *The Council's Finding that a Permanent Trapping Cabin Was Consistent with the Bering Straits Plan Had a Reasonable Basis.*

The Council concluded that the "issuance of a permit for the erection of the proposed Timber Creek cabin is consistent with the [Bering Straits Plan]."[10] An initial determination underlying the hearing officer's analysis was that the proposed cabin will be in a Permit Notification Area, not an Important Use Area. She also concluded that the proposed cabin "will not have an adverse impact on either subsistence resources or the habitat of subsistence resources."

1. *The proposed cabin site is not in an Important Use Area.*

■ Whether the proposed cabin is in an Important Use Area.[11] is a question of law involving agency expertise, requiring a "reasonable basis" standard of review. *Cook Inlet Pipe Line Co. v. Alaska Pub. Utils. Comm'n*, 836 P.2d 343, 348 (Alaska 1992). Under this standard of review "we give deference to the agency's determination 'so long as it is reasonable, supported by the evidence in the record as a whole, and there is no abuse of discretion.'" *Id.* (quoting *Kodiak Western Alaska Airlines, Inc. v. Bob Harris Flying Serv., Inc.*, 592 P.2d 1200, 1203 n. 7 (Alaska 1979)).

■ Both parties agree that the proposed cabin lies in the Koyuk River drainage. The conflict concerns whether the entire Koyuk River drainage is an Important Use Area under the Bering Straits Plan, a question which has policy implications apart from the individual facts of this case. *See Galt v. Stanton*, 591 P.2d 960, 965–66 (Alaska 1979) (Rabinowitz, J. concurring) ("The reasonable basis test is utilized by this court whenever the agency is, in effect, making law by creating standards or setting criteria which will be used to evaluate future situations in addition to the individual cases before it."). We conclude that the Council had a reasonable basis for its decision that the entire Koyuk River drainage is not an Important Use Area.

The Council's conclusion that the proposed cabin is not in an Important Use Area rejected the recommendation of Coastal District

9. Under the current version of AS 46.40.100(b), this is changed. Now the Council must review the decision of the coordinating agency to determine whether the agency has fairly considered the petitioner's comments. AS 46.40.100(b)(1)(A).

10. AS 46.40.100(d) states:
    (d) Except when a petition has been filed under AS 46.40.096(e), in determining whether a state agency is complying with a district coastal management program with respect to its exercise of regulation or control of the resources within the coastal area, the council shall find in favor of the agency if
    (1) the use or activity for which the permit, license, or approval is granted is consistent with the district coastal management program and regulations adopted under it; and

(2) the use or activity for which the permit, license, or approval is granted is consistent with requirements imposed by state statute, regulation, or local ordinance applicable to the use or activity.

11. Bering Straits Plan *4.4.2 Important Use Areas:*

Some areas within the region warrant special attention due to the presence of highly productive wildlife habitat, the ability to sustain a large part of a village's subsistence needs, the occurrence of unusual historical sites or large mineral deposits, recreation, energy development, hazardous areas, or the presence of important fisheries. These areas are very important to the communities within the Bering Straits CRSA and are identified on Map 4–1.

which, by regulation, is an expert on its own coastal plan. 6 AAC 50.120(a). The Bering Straits Plan states, "[t]his Important Use Area, [the Koyuk River drainage], includes the Koyuk River and the coastal waters extending one mile from the ordinary high water of the Koyuk River at its confluence with Norton Bay."[12] The Council concluded that this language completely contained the description for the Important Use Area. In other words, only the river and the coastal waters extending one mile from the river's high-water confluence with the bay are considered an Important Use Area. Map 4–1 in the Bering Straits Plan shows the Important Use Area; it contains a bold line drawn up the river valley.

The Plan's description of the Solomon River drainage, another Important Use Area, supports this conclusion. The Plan describes it as "the drainage of the Solomon River upstream" and notes a "corresponding boundary line around the entire river drainage." It is reasonable to conclude that if Coastal District had wanted to make the area that now includes the proposed cabin site part of an Important Use Area, it would have described the Koyuk River drainage as carefully and expansively as the Solomon River drainage.

Additionally, the hearing officer found that the description of the "essential subsistence use area" only comprised the river and the river valley, not the entire river drainage. Her findings included that only the river and its valley "are critical to the villages' subsistence needs."

The Council's analysis regarding Permit Notification Areas (PNA) is persuasive. Both parties agree that the proposed cabin site is in a PNA. By definition, PNA's are outside of the coastal zone boundary; a location within a PNA cannot simultaneously be in an Important Use Area. *See* Bering Straits Plan § 3.2 (Coastal Boundary).

While Coastal District raised evidence controverting the Council's determination, such evidence does not render the Council's decision erroneous under the deferential reasonable basis standard.[13] We conclude that the Council's decision that the proposed cabin would not be in an Important Use Area has a reasonable basis.

2. *The proposed cabin will not adversely affect subsistence use or wildlife in the area.*

Whether the proposed cabin will affect subsistence use or wildlife is a question of fact, reviewed under the "substantial evidence" standard. *Handley*, 838 P.2d at 1233. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Keiner*, 378 P.2d at 411). Under this standard, we do not independently weigh the evidence, but only determine whether such evidence exists. *See Municipality of Anchorage, Police & Fire Retirement Bd. v. Coffey*, 893 P.2d 722, 726 (Alaska 1995).

The following testimony constituted substantial evidence to support the Council's conclusion that construction of the proposed cabin "will not negatively impact the subsistence resources in the area."

Koontz testified that he would build the cabin with white spruce logs "selectively cut over a large area so as to avoid making a clearing." The roof would be made out of sod "which will minimize its visibility from the air." The hearing officer considered Koontz's plan to dispose of all anticipated waste products. A Division of Forestry representative testified that "careful thinning of trees would be beneficial to the land."

---

12. The Bering Straits Plan § 4.4.2.7 clarifies why the area was designated as an Important Use Area. The two specific designations for this area are habitat and subsistence.

13. Coastal District argues that the Bering Straits Plan's map was meant as a "visual aid," not as a defining tool. Coastal District employs the plain language of the Plan by arguing that the word "includes" ("includes the Koyuk River and the coastal waters") should be defined similarly to other ACMP regulations, meaning "including but not limited to." 6 AAC 80.900(21); 6 AAC 85.900(10). Coastal District also highlights the fact that the name of the Important Use Area is the "Koyuk River Drainage," which supports its assertion that the entire river drainage is included in the Important Use Area.

With regard to wildlife impact, the hearing officer found

> no evidence from which to conclude that Mr. Koontz's trapping activities have had or will have an impact on the subsistence resources.... Mr. Nelson [the area biologist] testified that he does not believe that Mr. Koontz's activities will impact wildlife.... Nor does he believe that Mr. Koontz's operation of his snowmachine to check his traplines will have an impact on the subsistence resources.

Mr. Nelson testified that "the cabin will have no impact on moose or caribou ... [and furbearers] might actually increase in numbers near the cabin."

The hearing officer found Koontz's use of the Camp Haven cabin highly relevant to his predicted use of the proposed cabin. The officer rejected Coastal District's argument that she should consider the use and impact of another cabin, the Shaktoolik River cabin, to predict the impact of the proposed cabin. The officer found that the Shaktoolik River cabin is a public-use cabin, located on a well-traveled river route in an area densely populated by caribou. In contrast, the proposed cabin is not likely to be used by the public except in emergencies and is not on any trail or in an area well populated by large wildlife.

The Coastal District claimed that all foreign elements in "the environment would negatively impact the ecosystem in the surrounding area." However, the hearing officer found the testimony for DNR to be more credible than that of Coastal District. She found that "no evidence was offered to substantiate [the] opinions" of Coastal District witnesses. Also, she found that Coastal District witnesses' testimony were "predicated on assumptions which have no factual basis in the record."

In light of the circumstances discussed above, we conclude that the Council relied on substantial evidence to decide that the proposed cabin would not adversely affect subsistence use and wildlife in the Timber Creek area.

D. *The Weight that DNR Afforded Coastal District's Comments Is Beyond the Scope of this Appeal.*

██ We decline to review whether DNR afforded Coastal District due deference during its consistency determination. The final administrative determination of the permit application was made during a *de novo* hearing conducted by the Council. There is no indication that the degree of deference that DNR gave Coastal District's comments during the first proposed consistency determination influenced the hearing which the Council conducted. Any dispute concerning such deference therefore is beyond the scope of our review.

E. *The Issue of the Council's Jurisdiction over NWAP Has No Affect on the Resolution of this Case.*

██ We decline to review whether the Council has jurisdiction to apply NWAP, because the applicability of NWAP, or the lack thereof, has no affect on the outcome of this case. If NWAP is not applicable, we have already concluded that the cabin is consistent with ACMP and the Bering Straits Plan. If NWAP applies, a reasonable basis exists for the Council's conclusion that the proposed cabin is consistent with the Plan. NWAP states that "trapping cabin construction permits should not be issued if the cabin will conflict with existing trapping and subsistence activities." The Council already concluded that the proposed cabin would not adversely affect wildlife or subsistence trapping in the area. Thus it had a reasonable basis for determining that the proposed cabin was consistent with NWAP.

IV. *CONCLUSION*

We AFFIRM the Council's determination that a permanent trapping cabin is consistent with ACMP and the Bering Straits Plan. We decline to reach the issue whether DNR afforded Coastal District's comments due deference. We also decline to review whether the Council has jurisdiction to apply NWAP.