*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| STATE OF ALASKA, BOARD OF CHIROPRACTIC EXAMINERS, | ) ) ) | Supreme Court No. S-18883 |
| Petitioner, | ) ) | Superior Court No. 4FA-22-01329 CI |
| v. | ) ) | O P I N I O N |
| AARON SHOEMAKER, | ) ) | No. 7786 – September 19, 2025 |
| Respondent. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Thomas I. Temple, Judge.

Appearances: Robert Kutchin, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Petitioner. Bradly A. Carlson, Carlson Law Group, LLC, Anchorage, for Respondent.

Before: Carney, Borghesan, and Pate, Justices. [Maassen, Chief Justice, and Henderson, Justice, not participating.]

BORGHESAN, Justice.

## I. INTRODUCTION

The Board of Chiropractic Examiners found that a chiropractor violated professional standards by committing lewd or immoral conduct with a patient, practicing while unfit, refusing to comply with a health mandate, and being convicted

of crimes demonstrating unfitness for practice. It revoked his license to practice, a sanction it had never before imposed.

The superior court reversed the Board's sanction. It ruled there was not substantial evidence to support most of the Board's findings. And it concluded that the Board had violated its statutory duty to seek consistency with previous sanctions because it did not consider disciplinary decisions by other professional licensing boards in Alaska and in other jurisdictions.

We reverse the superior court's decision and uphold the Board's rulings. The Board's findings, when reviewed with the proper level of deference due the initial factfinder, are supported by substantial evidence. And the Board's sanction is consistent with its statutory mandate to seek consistency with prior rulings. This mandate does not require a licensing board to seek consistency with the rulings of licensing boards for different professions. And the troubling facts of this case gave the Board a reasonable basis to impose the most severe sanction of complete license revocation.

## II. FACTS AND PROCEEDINGS

### A. Facts

Aaron Shoemaker became a licensed chiropractic physician in Alaska in 2017. The next year he opened his own private practice in Fairbanks called Advanced Chiropractic.

In April 2020, near the start of the global COVID-19 pandemic, Governor Mike Dunleavy issued Health Mandate 015, permitting chiropractic doctors to resume treatment following a statewide lockdown. The mandate required chiropractic doctors to adhere to safety and sanitation guidelines established by the U.S. Centers for Disease Control, including the directive to wear a surgical facemask while treating patients. The Board, which regulates the practice of chiropractic medicine in Alaska, considered compliance with the health mandate part of the minimum professional standards for practice.

In a telephone conversation with the Alaska Chiropractic Society,[1] Dr. Shoemaker stated that he would not comply with the mask mandate. He then wrote several social media posts to similar effect on both his personal and business accounts. Most notably, Shoemaker proclaimed:

> I hope Big Brother doesn't find out I'm not wearing a mask at work. But if they do it's ok. I will stand behind my education and constitution. I will not wear a mask at Advanced Chiropractic and please anyone offended by this statement remove yourself from my Facebook and feel free to call me an asshole as you leave.

A Chiropractic Society employee filed a complaint with the Board.

Around this time Dr. Shoemaker exhibited behaviors suggesting a mental health breakdown. He moved out of his apartment at his landlord's request. As he left the premises he defecated in the kitchen and left a note for his residential landlord that read: "Refer to me as Santa Claus or Dr. Shoemaker." The landlord filed a complaint. Dr. Shoemaker also mailed a bagel containing feces to his mother. Dr. Shoemaker continued to post inflammatory comments on his clinic's social media account. After receiving several complaints from the public, the Division of Corporations, Business and Professional Licensing (the Division) initiated an investigation on the Board's behalf.

Dr. Shoemaker began living in his clinic, which was located in a commercial building that also housed a field office for a federal law enforcement agency. In June 2020 the Division's investigator received reports from neighboring tenants that Dr. Shoemaker had harassed occupants of the law enforcement office.

Early one morning Dr. Shoemaker noticed a piece of construction equipment with the keys inside. He stole it and drove it down the side of a highway,

---

[1] The Alaska Chiropractic Society is voluntary membership organization available to licensed chiropractic doctors in Alaska. It is distinct from the Board of Chiropractic Examiners. *See* AS 08.20.010.

running over several road signs. Dr. Shoemaker abandoned the equipment after it got stuck, posted photos of himself with it on social media, and then anonymously reported his location to police. Officers found him in a nearby dumpster while on the phone with a 911 operator. Dr. Shoemaker was charged with first-degree vehicle theft and third-degree criminal mischief, both felonies.

Dr. Shoemaker was placed on supervised release in July. But he violated his release conditions by failing to show up for drug testing. In August he attempted to flee from pretrial enforcement officers who arrived at his clinic. He was arrested and charged with two misdemeanor counts for violating conditions of release.

Once released again Dr. Shoemaker posted a video to social media in which he told his landlord that he would continue to tear down signs that required building entrants to wear a mask because "if [his] patients want[ed] to come in and get treated, they [would] not wear a face mask." Dr. Shoemaker posted another video of himself in his clinic wielding two firearms during a phone conversation with his pretrial enforcement officer. Shoemaker cocked the hammer of the gun and threatened that he would defend himself if the officer tried to arrest him again. The day after, he posted another video of himself wielding two firearms, noting an ongoing dispute with federal agents in the office space next door. He stated, "If the fucking government wants to beat down our fucking door and come after us, well then, . . . they're going to get a lead sandwich." It was around this time that Dr. Shoemaker sent a profanity-laced email to the prosecutor in his criminal case, forwarding copies of the email to the Board and to one of Alaska's United States Senators.

In September 2020 Dr. Shoemaker was involuntarily committed to a psychiatric facility for approximately one week and was then transferred to the custody of the Department of Corrections. The next month he was placed on supervision again and released into his mother's custody.

In March 2021 Dr. Shoemaker pled guilty to attempted vehicle theft, fourth-degree criminal mischief, and two counts of release-condition violations, all

misdemeanors. He then traveled to South America, where he continued to offer chiropractic care.

The Board's investigation into complaints against Dr. Shoemaker led to the discovery of an allegation by one of his former employees, C.M., a massage therapist. C.M. reported to police that Shoemaker digitally penetrated her vagina during a massage at his clinic. C.M. provided detectives with screenshots of a text message exchange between her and Shoemaker shortly after the massage. In the messages C.M. expressed that she was surprised and "fe[lt] bad" about Dr. Shoemaker's conduct. She resigned from her job at the clinic.

During an interview with detectives, Dr. Shoemaker denied penetrating C.M. but admitted that he "got really close." He admitted that upon initiating the massage he was unsure whether C.M. desired sexual contact but nevertheless began massaging her "inner thigh" given her "flirty" demeanor in the weeks prior to the massage. He explained that he perceived C.M. as desiring sexual contact, and he disclosed to investigators that he "kind of want[ed] that to happen." He acknowledged that he "knew what [he] was doing was stupid" and that his actions "jeopardize[d] ending [his] career."

Detectives forwarded the case to the district attorney. But just before the case was presented to a grand jury, C.M. withdrew her complaint and the case was closed. C.M. told investigators that she knew the massage she was receiving was sexual in nature and was okay with where the massage was going. Dr. Shoemaker was not indicted.

B.    Proceedings

In September 2020 the Board summarily suspended Dr. Shoemaker's license to practice, finding that his continued practice presented a "clear and immediate

danger to public health and safety."[2] The Division then filed an accusation seeking permanent revocation of his license for eight counts of misconduct grouped into four broad categories of sanctionable conduct: (1) lewd and immoral sexual misconduct with a patient, (2) practicing while unfit, (3) refusing to comply with a health mandate, and (4) incurring criminal convictions affecting his ability to practice competently and safely.

**1.     Administrative hearing**

A hearing was held before an administrative law judge (ALJ) from the Office of Administrative Hearings.

Regarding the count of sexual misconduct, Dr. Shoemaker testified that he offered massages, electric stimulation, ultrasound, and chiropractic adjustments to his employees as a "perk" of the job. He testified that C.M. often complained of hip pain and that the two exchanged services on eight to ten prior occasions. He maintained that C.M. was not his patient but confirmed the statements he made to detectives in 2018 recounting his actions during the massage. The interviewing detective also testified, recalling Dr. Shoemaker's "weak" denials of the allegations.

Regarding the count of violating the mask mandate, Dr. Shoemaker testified that his public statements about masking were mostly for entertainment. But when asked whether he wore a mask while treating patients, he replied that he did so "sometimes." When asked about the purpose of recording videos of himself brandishing firearms, he testified that his purpose was to educate viewers on gun safety.

---

[2]     As an emergency measure, the Board may suspend a license before a formal hearing is held. *See* AS 08.01.075(c) (authorizing board to summarily suspend "a licensee from the practice . . . before a final hearing is held or during an appeal if the board finds that the licensee poses a clear and immediate danger to the public health and safety"); AS 08.01.010(11) (making provision applicable to Board of Chiropractic Examiners).

Regarding the count based on criminal convictions, Dr. Shoemaker characterized the convictions as a "misunderstanding," suggesting that "the punishment [did not] fit the crime." He asserted that the owner of the machinery should not have left the keys in the vehicle. He suggested that his criminal convictions and sentence were "excessive" because he did not damage the vehicle and did not intend to sell it. He admitted that taking the machine was a "poor decision" but maintained that he should not be punished further for it.

Dr. Shoemaker presented testimony about a psychological evaluation that he had obtained independently of the disciplinary proceeding, which had recommended individual psychotherapy. Dr. Shoemaker testified that he did not think therapy would mitigate his behavior but that he would engage in therapy if it was "what the Board need[ed]."

## 2. Board of Chiropractic Examiners' decision

Following the hearing the ALJ found that summary suspension was proper and recommended permanent revocation of Dr. Shoemaker's license to practice. In February 2022 the Board of Chiropractic Examiners adopted the decision.

The Board first determined that a preponderance of the evidence supported the conclusion that Dr. Shoemaker engaged in lewd or immoral conduct in connection with the delivery of professional services to a patient.[3] It rejected his contention that C.M. was not a patient and that "the massage was a private encounter between consenting adults." Recognizing that the term "patient" was not defined in statute or regulation, the Board considered statutory definitions related to chiropractic care;[4] the types of treatments Dr. Shoemaker provided to C.M.; the frequency of these

---

[3] *See* AS 08.20.170(a)(8); 12 Alaska Administrative Code (AAC) 16.930(a); Code of Ethics, Am. Chiropractic Ass'n, Tenet VI (2007) (on file with the Division of Corporations, Business & Professional Licensing, Juneau).

[4] AS 08.20.900(3), (4), (6).

treatments; and the fact that Dr. Shoemaker provided his employees chiropractic care as a benefit of employment. Considering the totality of the circumstances, the Board concluded that a doctor-patient relationship had formed and that Dr. Shoemaker's conduct during the massage violated professional standards.

The Board found that Dr. Shoemaker made sexual contact with C.M., attempted to make sexual contact with her, and committed sexual misconduct. It inferred that "the massage was more intimate than Dr. Shoemaker admit[ted]" and that even if he had not penetrated C.M., he likely touched her genitals. The Board explained that even if there was no sexual contact, there was ample evidence that Dr. Shoemaker attempted sexual contact with C.M., pointing to his own statements to police describing his hand moving closer to C.M.'s genitals while asking her "if what he was doing was okay." It concluded that he made a "substantial step towards sexual contact." At minimum, the Board found that Dr. Shoemaker committed sexual misconduct: "behavior, a gesture, or an expression that may reasonably be interpreted as seductive, sexually suggestive, or sexually demeaning to a patient."[5] Again the Board cited Dr. Shoemaker's own statements to police where he admitted that "he behaved in a sexual manner towards C.M. during the massage" and that he knew that he "crossed a line" professionally. It rejected his defense that the contact was consensual, highlighting its regulations that bar such a defense.[6]

The Board determined that Dr. Shoemaker violated professional standards when he attempted to continue practicing chiropractic care after becoming unfit due to

---

[5]    12 AAC 16.930(e)(3).

[6]    *See* 12 AAC 16.930(c)(1) ("It is not a defense to a disciplinary action alleging a violation of this section that the contact occurred with the consent of the patient[.]").

suffering a mental disability.[7]  It determined that Dr. Shoemaker's conduct in 2020, including various incidents involving feces, demonstrated that he was unfit to practice, yet he still continued to practice.[8]

The Board also found that Dr. Shoemaker refused to comply with the health mandate requiring providers to wear facemasks while treating patients.[9]  It pointed to his online statement declaring that he was not wearing a mask while treating patients.  The Board rejected his arguments that his statements could not constitute evidence that he actually defied the mandate and that he was being "punished for his speech."  The Board explained that Dr. Shoemaker's speech was not the offending act, but was rather evidence that he did not actually wear a mask at work, in violation of the mandate.

Lastly, the Board found that Dr. Shoemaker was convicted of crimes affecting his ability to practice competently and safely.[10]  The Board determined that Dr. Shoemaker's misdemeanor conviction for attempted vehicle theft was a crime of moral turpitude that "necessarily impact[ed] his fitness to practice."  The Board noted Dr. Shoemaker's testimony characterizing the event as a "joyride."  It found troubling his decision to blame the victim for "creating the opportunity" for him to take the

---

[7]    AS 08.20.170(a)(7)(B)-(C) (allowing discipline for licensee's "continued or attempted" practice "after becoming unfit due to . . . addiction or severe dependency on alcohol or a drug that impairs the person's ability to practice safely . . . or mental disability").

[8]    *See* AS 08.20.170(a)(7).

[9]    *See* 12 AAC 16.920(a)(15) (adopting by reference 2007 American Chiropractic Association Code of Ethics and providing that licensee who fails to adhere to them violates minimum professional standards in Alaska); *see also* Code of Ethics, Am. Chiropractic Ass'n, *supra* note 3, Tenet II ("Doctors of chiropractic should maintain the highest standards of professional and personal conduct, and should comply with all governmental jurisdictional rules and regulations.").

[10]    AS 08.20.170(a)(4)(A).

equipment. It found that he had a "predatory worldview" and "deflec[ed] blame for his own misconduct." The Board concluded that Dr. Shoemaker was not trustworthy, a quality inherent to the "notion of competent and safe practice."

Having found that Dr. Shoemaker committed each violation alleged in the accusation, the Board determined that revocation of his license was the appropriate sanction.

The Board identified its statutory obligation to "seek consistency in the application of disciplinary sanctions."[11] Acknowledging that it had never before revoked a chiropractor's license to practice, the Board reasoned that this did not prohibit it from doing so in Dr. Shoemaker's case. It reasoned that the statute required it to "seek consistency in sanctions between licensees who have committed similar conduct" and explain any decision to significantly depart from prior precedent in a case involving similar facts. It then observed that there was no previous case, "whether resolved through consent agreements or otherwise," with facts similar to Dr. Shoemaker's, given the "scope of behaviors — sexual misconduct, willfully violating a Health Mandate, practicing while unfit, and criminal conduct — and the fact that some of the conduct took place years before the conduct that arose during an apparent mental health episode."

In choosing revocation as the appropriate sanction, the Board noted Dr. Shoemaker's lack of remorse and his pattern of "justif[ying] his misdeeds by blaming others." It pointed out that he declined to engage in therapy "despite an evaluation concluding that counseling would be imperative to avoid a relapse of the very behavioral/mental health concerns that gave rise to this case." It also viewed his continued practice in South America pending resolution of the proceedings as a reflection of "his lack of insight into his misconduct and his unfitness for licensure."

---

[11] AS 08.01.075(f).

The Board concluded that the totality of these circumstances "overwhelmingly support[ed] revocation" of Dr. Shoemaker's license.

Shoemaker appealed to the superior court.

### 3. Superior court order reversing Board's decision

The superior court reversed and remanded the Board's decision to permanently revoke Dr. Shoemaker's license. The court agreed that it was proper to temporarily suspend his license. But it vacated all but one disciplinary violation against Dr. Shoemaker, finding insufficient evidence for each violation except for those concerning his criminal convictions.

The court first determined that the Board erred in its finding that Dr. Shoemaker engaged in lewd or immoral conduct in connection with the delivery of professional services to patients. The court agreed with the Board that C.M. was Dr. Shoemaker's patient during the massage. But it ruled that there was insufficient evidence that lewd or immoral conduct actually occurred. The court reasoned that C.M.'s statements were uncorroborated hearsay because she "chose[] not to testify" at Dr. Shoemaker's hearing "despite being ordered to do so." It explained that Dr. Shoemaker's statements about the massage were, by themselves, insufficient to support a finding that Dr. Shoemaker penetrated C.M., that he otherwise made or attempted to make sexual contact with her, or that "any of the touches rose above what would be considered 'for the purpose of administering a recognized and lawful form of chiropractic examination or treatment.' "[12]

The court next determined that the Board erred in finding that Dr. Shoemaker continued to practice while unfit, finding insufficient evidence to support the finding that Dr. Shoemaker saw, or attempted to see, any patients while he was exhibiting troubling behaviors in 2020.

---

[12]     *See* 12 AAC 16.930(e)(2)(C)(ii).

The superior court then rejected the Board's finding that Dr. Shoemaker violated minimum professional standards for his refusal to wear a facemask while treating patients. It ruled that the Board could not rely solely on Dr. Shoemaker's statements that he would not adhere to masking protocol, "especially when there [was] direct testimony establishing that [he] did comply with masking mandates." The court reasoned that Dr. Shoemaker was not required "to agree with all governmental jurisdictional rules and regulations." Therefore, it ruled that Dr. Shoemaker's "public protests and rantings [did] nothing to provide evidence that he disobeyed the mandate when it came time to see patients, no matter how explicitly he said he would not [obey]."

The superior court affirmed the Board's finding that Dr. Shoemaker committed crimes bearing on his ability to practice competently and safely. Yet the court determined that the Board failed to consider mitigating factors when imposing discipline, namely that his felony charges were pled down to misdemeanors and that he was suffering a mental health crisis when he committed the crimes. The court also suggested that the Board's choice to punish misdemeanors with license revocation was "incongruous, allow[ing] no room for harsher punishment for harsher crimes."

Lastly, the superior court concluded that the Board abused its discretion when choosing to permanently revoke Dr. Shoemaker's license. The court reasoned that while Dr. Shoemaker's case was of first impression "and the first case the Board will publish," the Board was obliged to review disciplinary proceedings from other analogous boards in Alaska and in other jurisdictions before imposing sanctions. The superior court concluded that the Board's failure to do so constituted an abuse of its disciplinary power, "setting itself up for disaster by choosing revocation for its first published order, leaving no room for more extreme punishments for more extreme conduct."

The Board petitioned for review.[13]  We granted the petition and ordered briefing.

## III.  STANDARD OF REVIEW

When a superior court acts as an intermediate court of appeal reviewing an administrative agency's decision, "we independently review the merits of the administrative decision, giving no deference to the superior court's decision."[14]

Board findings of fact are reviewed for substantial evidence.[15] "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "[16]

"We apply the reasonable basis standard to questions of law involving 'agency expertise or the determination of fundamental policies within the scope of the agency's statutory functions.' "[17]  Under this standard "we 'seek to determine whether the [Board's] decision is supported by the facts and has a reasonable basis in law.' "[18] Questions of law that do not involve special agency expertise are reviewed under the

---

[13]    *See City & Borough of Juneau v. Thibodeau*, 595 P.2d 626, 629 (Alaska 1979) ("[A]n order of the superior court issued in its appellate capacity which remands for further proceedings is not a final judgment . . . .  However, a party to such a remand may . . . invoke our discretionary review jurisdiction . . . .").

[14]    *Lookhart v. State, Div. of Corps., Bus., & Pro. Licensing, Bd. of Dental Exam'rs*, 548 P.3d 1094, 1097-98 (Alaska 2024) (quoting *Odom v. State, Div. of Corps., Bus. & Pro. Licensing*, 421 P.3d 1, 6 (Alaska 2018)).

[15]    *Wendte v. State, Bd. of Real Est. Appraisers*, 70 P.3d 1089, 1091 (Alaska 2003).

[16]    *Thoeni v. Consumer Elec. Servs.*, 151 P.3d 1249, 1253 (Alaska 2007) (quoting *Circle De Lumber Co. v. Humphrey*, 130 P.3d 941, 946 (Alaska 2006)).

[17]    *Davis Wright Tremaine LLP v. State, Dep't of Admin.*, 324 P.3d 293, 299 (Alaska 2014) (quoting *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011)).

[18]    *Id.* (quoting *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987)).

substitution of judgment standard, where "we apply our independent judgment and adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[19] We use our independent judgment to resolve issues of statutory interpretation that do not involve agency expertise.[20]

An agency's selection of a particular sanction implicates its expertise and is reviewed using the reasonable basis standard.[21] In deciding whether an agency's selection of a sanction was reasonable, we "ask 'whether there was a prejudicial abuse of discretion,' which we will find 'if the agency has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.' "[22]

## IV. DISCUSSION

The Board asks us to reinstate its decision to revoke Dr. Shoemaker's license. It argues that the superior court failed to give due deference to its factual findings and legal conclusions. Dr. Shoemaker responds that the Board's misconduct findings and ultimate sanction rest on factual and legal errors. We examine each disputed finding of misconduct[23] and then consider its decision to sanction Dr. Shoemaker by permanently revoking his license.

---

[19]     *Thoeni*, 151 P.3d at 1253.

[20]     *Tesoro Alaska Petroleum Co.*, 746 P.2d at 903-04.

[21]     *Lookhart v. State, Div. of Corps., Bus., & Pro. Licensing, Bd. of Dental Exam'rs*, 548 P.3d 1094, 1098 & n.12 (Alaska 2024).

[22]     *Id.* at 1098 (quoting *Fantasies on 5th Ave., LLC v. Alcoholic Beverage Control Bd.*, 446 P.3d 360, 367 (Alaska 2019)).

[23]     The Board does not challenge the superior court's conclusion that it lacked substantial evidence that Dr. Shoemaker practiced while not fit to do so.

**A.** **The Board Did Not Err In Finding That Dr. Shoemaker Engaged In Lewd Or Immoral Conduct With A Patient.**

The Board may impose a disciplinary sanction on a licensee when the Board finds that the person "engaged in lewd or immoral conduct in connection with the delivery of professional service to patients."[24]  " '[L]ewd or immoral conduct' includes sexual misconduct, sexual contact, or attempted sexual contact, with a patient outside the scope of generally accepted methods of examination or treatment of the patient . . . ."[25]  "It is not a defense to a disciplinary action alleging a violation of this section that the contact occurred with the consent of the patient."[26]

The Board sanctioned Dr. Shoemaker for engaging in lewd or immoral conduct during the massage of C.M.[27]  Two of its rulings are relevant to this petition: (1) that C.M. was Dr. Shoemaker's patient for purposes of disciplinary sanctions and (2) that evidence supported the conclusion that he engaged in lewd or immoral conduct. The superior court agreed that C.M. was a patient but ruled there was not sufficient evidence to support a finding of lewd or immoral conduct.  Dr. Shoemaker attacks the first ruling,[28] while the Board attacks the second.

---

[24]  AS 08.20.170(a)(8).

[25]  12 AAC 16.930(d).

[26]  12 AAC 16.930(c)(1).

[27]  AS 08.20.170(a)(8); *see* 12 AAC 16.930(a) (prohibiting lewd or immoral conduct with patients).

[28]  Dr. Shoemaker did not file a cross-petition seeking our review of this issue, which arguably means this issue is not properly before us.  But we nevertheless address it because:  (1) The Board never asserted that the issue was not squarely before us and addressed the issue on the merits; and (2) the Board's petition asked us to "affirm all aspects of the Board's initial decision."

**1.   The Board had a reasonable basis to determine that C.M. was Dr. Shoemaker's patient.**

Neither the Board's regulations nor the statute governing it define the term "patient."[29]  The Board determined that C.M. was Dr. Shoemaker's patient based on the totality of circumstances:  Dr. Shoemaker provided his employees chiropractic care as an employment benefit; he provided C.M. not only massages but also chiropractic adjustments on her hip, ultrasound, and other therapies; and he had done so eight to ten times by the time the incident occurred.  The superior court upheld this aspect of the Board's ruling.

Dr. Shoemaker challenges this conclusion.  He acknowledges that the term "patient" is undefined and points to the ordinary meaning of that term, as defined in the dictionary:  "an individual awaiting or under medical care or treatment."[30]  He argues that the Board lacked a reasonable basis to conclude that C.M. was under medical care or treatment because she was not billed and did not have scheduled appointments, an evaluation, treatment plan, or medical chart.  He also emphasizes evidence that C.M. was training to become a chiropractic assistant and had provided him a massage and other types of care.  He cites *Smith v. Radecki*[31] to argue that "not all actions of 'treating' an individual form a physician-patient relationship."

In our view, the Board's interpretive approach, which it described as based on the "totality of the circumstances," does not seem inconsistent with the plain meaning definition of "patient" that Dr. Shoemaker advocates.  The Board examined whether the actions Dr. Shoemaker performed on C.M. fit the definition of chiropractic care — in effect, whether they were "medical care or treatment."  It also considered the

---

[29]   *See* 12 AAC 16.930; 12 AAC 16.990; AS 08.20.010-.900.

[30]   Dr. Shoemaker cites Merriam-Webster and notes that the State itself proposed this approach to defining "patient" in its prehearing brief before the ALJ.

[31]   238 P.3d 111 (Alaska 2010).

circumstances under which he performed these acts, noting that their frequency was "normal" for typical chiropractic patients (which Dr. Shoemaker conceded) and that they were provided as a benefit to employees, rather than as a purely social gesture. Therefore, Dr. Shoemaker's challenge is not so much to the Board's interpretive approach as to the conclusion it reached based on the evidence before it. Dr. Shoemaker's argument is that the Board's conclusion lacked a reasonable basis because other pieces of evidence — the lack of evaluation or treatment plan, appointments, or chart notes — showed his acts were not really "medical care or treatment."

We are not persuaded by Dr. Shoemaker's argument. Whether a person is a patient for disciplinary purposes is a question of law implicating the Board's expertise that we review using the reasonable basis standard.[32] The reasonable basis standard is highly deferential. We "review the . . . decision only to the extent necessary to ascertain whether the decision has a reasonable basis," ensuring "that the agency has taken a hard look at the salient problems and . . . genuinely engaged in reasoned decision making" to reach its conclusion.[33]

---

[32] *Manning v. State, Dep't of Fish & Game*, 355 P.3d 530, 535 (Alaska 2015) (using reasonable basis standard to review agency's application of law to fact); *W. States Fire Prot. Co. v. Mun. of Anchorage*, 146 P.3d 986, 989 (Alaska 2006) (applying reasonable basis standard to review agency determination "requir[ing] resolution of policy questions . . . within the agency's area of expertise and . . . inseparable from facts underlying the agency's decision"); 12 AAC 16.010(a) (indicating Board's objective "to foster professional standards consistent with the best interests of the public").

[33] *Bering Straits Coastal Mgmt. Program v. Noah*, 952 P.2d 737, 741 (Alaska 1998) (quoting *Kuitsarak Corp. v. Swope*, 870 P.2d 387, 392 (Alaska 1994), *superseded by statute on other grounds as recognized in Kachemak Bay Conservation Soc'y v. State, Dep't of Nat. Res.*, 6 P.3d 270 (Alaska 2000)); *see id.* at 743 (reviewing agency's assessment of whether facts meet criteria enumerated in its statutes and regulations for reasonableness).

The Board's determination that C.M. was a patient was reasonable given the evidence of the types of care Dr. Shoemaker provided to her, the frequency of that care, and the fact that Dr. Shoemaker provided the care as an employee benefit. Our decision in *Smith v. Radecki* does not suggest otherwise. In that case, we held that there was no physician-patient relationship between a worker's compensation claimant and a doctor hired by the claimant's employer to perform an independent medical examination.[34] Here, by contrast, C.M. chose to have Dr. Shoemaker provide her with chiropractic care, and he did so on a routine and continuing basis. Therefore, the Board had a reasonable basis to conclude that C.M. was Dr. Shoemaker's patient when receiving care from him.

### 2. Substantial evidence supports the Board's finding that Dr. Shoemaker attempted sexual contact with C.M. in violation of ethical standards.

The Board found that Dr. Shoemaker committed lewd or immoral conduct by having sexual contact, attempting sexual contact, and committing sexual misconduct when he gave C.M. a massage. "Sexual contact" is defined as touching a patient's genitals (not requiring penetration), and "attempted sexual contact" is defined as engaging in conduct that constitutes a "substantial step towards sexual contact."[35] "Sexual misconduct" means behavior that "may reasonably be interpreted as seductive, sexually suggestive, or sexually demeaning to a patient."[36] The superior court vacated

---

[34]    *Smith*, 238 P.3d at 116-17.

[35]    12 AAC 16.930(e)(1)-(2).

[36]    12 AAC 16.930(e)(3). Additionally, the Board found that Dr. Shoemaker violated the American Chiropractic Association's Code of Ethics, which also prohibits sexual misconduct. Code of Ethics, Am. Chiropractic Ass'n, *supra* note 3, Tenet VI (indicating that sexual misconduct adversely affects public welfare, harms patients, exploits doctor-patient relationship, and violates public trust). The Code of Ethics is incorporated by reference as minimum professional standards governing chiropractors. 12 AAC 16.920(a)(15).

the sanction, ruling there was insufficient evidence to support the findings. The Board argues that the superior court failed to grant it the deference that the substantial evidence standard of review demands of an appellate court. We agree with the Board and uphold its finding that Dr. Shoemaker committed "lewd or immoral conduct" because substantial evidence shows that he engaged, at the very least, in "attempted sexual contact."

The task of a court reviewing an administrative agency's factual finding is to determine whether the finding is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[37] This standard is highly deferential, "reflect[ing] the prudence of deferring to a state professional board's special competence in recognizing violations of professional standards."[38]

The superior court ruled there was not enough evidence of what occurred between C.M. and Dr. Shoemaker. It reasoned that because C.M. had chosen not to testify, any prior statements of hers "considered now would be hearsay." It acknowledged that hearsay is admissible in administrative proceedings if corroborated, but then concluded that Dr. Shoemaker's testimony did not corroborate sexual misconduct. Recognizing that Dr. Shoemaker "did testify to touching C.M.'s hips and inner thighs" and also testified about his "desire to take it further," the court stated that "nothing about his testimony proves that it was anything more than necessary to the chiropractic treatment of an ailed hip."

There are several problems with this analysis. First, assuming C.M.'s text messages were hearsay, they were corroborated by Dr. Shoemaker's own responsive text messages, which are not hearsay because they are his own statements offered

---

[37] *Lookhart v. State, Div. of Corps., Bus., & Pro. Licensing, Bd. of Dental Exam'rs*, 548 P.3d 1094, 1098 (Alaska 2024) (quoting *Odom v. State, Div. of Corps., Bus. & Pro. Licensing*, 421 P.3d 1, 6 (Alaska 2018)).

[38] *Id.* (quoting *Odom*, 421 P.3d at 6).

against him.[39] His text messages state that he "had no intentions of that happening either" and indicate his desire not to "tell[] anyone" and not to "let[] it happen again." These statements are hard to explain if the massage went no further than necessary to treat C.M.'s hip. The text message exchange was further corroborated by Dr. Shoemaker's own recorded statement to police, which was not hearsay either. He told detectives that he wanted sexual contact to happen, that he moved his hand towards C.M.'s genitals, and that he only stopped when she told him to. Though Dr. Shoemaker denied touching or penetrating C.M.'s vagina, he admitted to detectives that he "got really close," that it was not "professional," and that he "knew what [he] was doing was stupid." At the hearing Dr. Shoemaker affirmed the accuracy of these prior statements.

Altogether this evidence is substantial enough to support the Board's finding that Dr. Shoemaker did commit lewd or immoral behavior with a patient by intentionally taking a substantial step towards touching C.M.'s genitals.

B.    **Substantial Evidence Supports The Board's Finding That Dr. Shoemaker Violated Professional Standards By Declining To Follow A Public Health Mandate.**

Chiropractors must adhere to the profession's Code of Ethics.[40] The Code of Ethics requires a licensee to "comply with all governmental jurisdictional rules and regulations."[41] The Board determined that Health Mandate 015, requiring chiropractors to wear masks during treatment, was such a rule or regulation. The Board found that Dr. Shoemaker did not wear a mask when treating patients and that by failing to do so he violated minimum professional standards. Under the substantial evidence standard

---

[39]    Alaska R. Evid. 801(d)(2)(A).

[40]    12 AAC 16.920(a)(15).

[41]    Code of Ethics, Am. Chiropractic Ass'n, *supra* note 3, Tenet II.

of review, we defer to the Board's finding unless "evidence detracting from the [Board's] decision is . . . dramatically disproportionate to the evidence supporting it."[42]

Dr. Shoemaker challenges the Board's finding on two grounds. First, he argues that his statements to the effect that "[he was] not wearing a mask at work" were merely his opinions about the mask mandate, not competent evidence of his conduct. This argument is not persuasive. Dr. Shoemaker's statements online and to other people indicating his refusal to wear a mask are admissions that may be offered against him.[43] And his statements can be reasonably interpreted as descriptions of his actual conduct, rather than merely "public discourse" about the merits of the mandate. For example, he posted on social media, "I'm not wearing a mask at work" and proclaimed that he would "not wear a mask at Advanced Chiropractic." In a video he also posted online, he told his landlord that "if [his] patients want[ed] to come in and get treated, they [would] not wear a face mask" and acknowledged that he repeatedly tore down signage requiring entrants to wear surgical masks in the shared commercial building.

Second, Dr. Shoemaker argues that evidence that he complied with the mandate disproportionately outweighs any remaining evidence used against him for this finding. He points to testimony from two former patients. One patient testified that Dr. Shoemaker wore a mask and the other testified that she could not recall whether he did or not.

It is not our role to "reweigh conflicting evidence, determine witness credibility, or evaluate competing inferences from testimony," as these functions are reserved for the Board, the primary factfinder.[44] The Board could reasonably have

---

[42]    *Odom*, 421 P.3d at 6 (emphasis omitted) (quoting *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 267 P.3d 624, 634 n.40 (Alaska 2011)).

[43]    *See* Alaska R. Evid. 801(d)(2)(A).

[44]    *McKitrick v. State, Pub. Emps. Ret. Sys.*, 284 P.3d 832, 837 (Alaska 2012) (quoting *Lindhag v. State, Dep't of Nat. Res.*, 123 P.3d 948, 952 (Alaska 2005)).

found that even if Dr. Shoemaker's witnesses testified truthfully that he wore a mask when he treated them, he did not always wear a mask, given his repeated statements that he would not do so. Indeed, Dr. Shoemaker himself testified that he wore a mask "sometimes." The evidence contradicting the Board's finding is not dramatically disproportionate to the evidence supporting it. Therefore, we affirm the Board's finding that Dr. Shoemaker violated the public health mandate.[45]

### C. There Was A Reasonable Basis For The Board's Ruling That Dr. Shoemaker's Convictions Demonstrated His Unfitness To Practice.

The Board may sanction a licensee convicted of a felony or "other crime that affects the person's ability to practice competently and safely."[46] The Board has a policy interest in regulating the conduct of its licensees according to its objective "to foster professional standards consistent with the best interests of the public."[47]

---

[45] Although we focus on whether the Board's decision was supported by substantial evidence, we address one aspect of the superior court's reasoning. The court stated that Dr. Shoemaker's statements about masking reflected widely held viewpoints, and it cited at length an online opinion piece written by a politician asserting that federal health officials lied about key facts in the early days of the COVID-19 pandemic. The court appeared to reason that these asserted lies were a reasonable basis for Dr. Shoemaker to "express skepticism of the COVID-19 mandates and to protest them by claiming he would not comply." The court's reliance on an extended discussion of asserted lies by federal officials and reference to an opinion piece that did not appear in the parties' briefing was not consistent with the deference required when sitting in its capacity as an appellate court. The sole issue facing the superior court was whether there was substantial evidence to support the Board's finding that Dr. Shoemaker did not wear a mask when treating patients. Although the court appeared to view Dr. Shoemaker's statements as merely "discourse" rather than evidence of Dr. Shoemaker's actions, it was the Board's role — not the court's — to weigh and draw inferences from the evidence. And it was certainly plausible to infer that Dr. Shoemaker's actions matched his words.

[46] AS 08.20.170(a)(4)(A).

[47] 12 AAC 16.010(a). The Board's decision characterized questions of whether Dr. Shoemaker's crimes are of moral turpitude and "affect[] his ability to

Therefore, we review its determination for reasonableness, asking only "whether the agency's determination is supported by the facts and is reasonably based in law."[48]

The Board cited our decisions involving crimes of "moral turpitude"[49] and decided that vehicle theft, even if only for a "joyride," was such a crime. It also noted that Dr. Shoemaker had been convicted of violating his conditions of release, but denied having done so. It found that his crimes, coupled with the lack of remorse and accountability he expressed at the hearing, undermined his trustworthiness and showed him to be unfit to practice.

The superior court vacated the Board's determination, concluding that the Board failed to consider "mitigating factors." The court stated that the Board "dismissed [Dr. Shoemaker's] health crisis simply because he did not admit he was experiencing one" but should have treated the psychosis as a mitigating factor. The court also reasoned that the Board should have considered that Dr. Shoemaker's felony

---

practice" as questions of fact. But Dr. Shoemaker does not challenge the factual findings regarding his conduct. Instead, he challenges the Board's application of law to these facts, which we review for reasonableness. *Manning v. State, Dep't of Fish & Game*, 355 P.3d 530, 535 (Alaska 2015).

[48]     *Koyukuk River Basin Moose Co-Mgmt. Team v. Bd. of Game*, 76 P.3d 383, 386 (Alaska 2003) (quoting *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999)); *W. States Fire Prot. Co. v. Mun. of Anchorage*, 146 P.3d 986, 989 (Alaska 2006) (reviewing for reasonableness "policy questions . . . within the agency's area of expertise [that] are inseparable from the . . . underlying" facts).

[49]     *Wendte v. State, Bd. of Real Estate Appraisers*, 70 P.3d 1089, 1092 (Alaska 2003) (holding there is "a presumed logical nexus between any crime of moral turpitude and the ability to satisfy the ethical standards of the real estate appraisal profession"); *Kenai Peninsula Borough Bd. of Educ. v. Brown*, 691 P.2d 1034, 1041 (Alaska 1984) (holding teacher's crime of moral turpitude "raises at least a presumption that there is a nexus between the teacher's act and the teacher's fitness to teach"); *Toney v. Fairbanks N. Star Borough Sch. Dist. Bd. of Educ.*, 881 P.2d 1112, 1116 (Alaska 1994) (holding there is no need for separate showing of nexus between act of moral turpitude and professional fitness).

charges were pled down to misdemeanors. And it suggested that the Board acted unreasonably by leaving "no room for harsher punishments for harsher crimes."

There are several problems with the superior court's reasoning. First, it did not cite, and we do not see, any legal authority suggesting that the Board must consider particular mitigating factors in deciding whether the crimes demonstrate unfitness to practice.[50] Rather, as noted earlier, the Board's decision must have a reasonable basis. If failing to consider a particular aggravating or mitigating factor were unreasonable given the circumstances, only then would the Board's decision lack a reasonable basis.

Second, the Board did acknowledge that Dr. Shoemaker was experiencing a mental health crisis at the time of his crimes and that he was not convicted of felonies. And it reasonably explained why Dr. Shoemaker's convictions nonetheless showed his unfitness to practice: namely, that at the hearing, despite his psychosis being long past, Dr. Shoemaker did not show remorse, blamed his victim, declined to pursue counseling recommended to prevent future psychotic episodes, and even denied violating his conditions of release, which undermined his credibility and revealed, in the Board's words, "a predatory worldview that creates serious questions about his trustworthiness." This is a convincingly reasonable explanation for the Board's conclusion that Dr. Shoemaker showed unfitness to practice. The superior court's suggestion that the Board left itself no room to impose harsher sanctions for harsher crimes overlooks that the Board relied not only on the crimes themselves, but on what Dr. Shoemaker's testimony about his crimes revealed about his character. Had Dr. Shoemaker shown honesty or remorse, the Board might have ruled differently.

---

[50] By the same token, we see no legal authority precluding the Board from considering particular mitigating factors it deems relevant.

**D. The Board Did Not Abuse Its Discretion When It Revoked Dr. Shoemaker's License.**

Professional licensing boards have statutory authority to impose sanctions ranging from peer review to permanent revocation.[51] But they must "seek consistency in the application of disciplinary sanctions" and "explain a significant departure from prior decisions involving similar facts in the order imposing the sanction."[52]

The Board acknowledged this duty and observed that it had never before revoked a license outside the context of a voluntary surrender. But it reasoned that there were no previous cases, "whether resolved through consent agreements or otherwise," presenting "similar facts" to Dr. Shoemaker's case. It cited the breadth of behaviors, from sexual misconduct to criminal conduct to violating a health mandate. And it noted Dr. Shoemaker's lack of remorse and insight, failure to undergo recommended counseling, and "lack of regard for the rights of others and his obligation to follow the law." It concluded that the circumstances "overwhelmingly support[ed]" permanent license revocation.

The superior court reversed, ruling that the Board had violated its duty to seek consistency because it had not cited the disciplinary decisions of other licensing boards for similar professions in Alaska or in other jurisdictions. The Board's failure to do so, the court ruled, constituted an abuse of its disciplinary power, "setting itself up for disaster by choosing revocation for its first published order, leaving no room for more extreme punishments for more extreme conduct."

The scope of a licensing board's duty to "seek consistency" in disciplinary sanctions is a question of statutory interpretation. Because it does not involve agency

---

[51]    AS 08.01.075(a).

[52]    AS 08.01.075(f).

expertise, we apply our independent judgment.[53]  "We construe statutes according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose."[54]

In our view, the most natural reading of the statute's text is that a licensing board must seek consistency with its own decisions.  The statutory text does not expressly say that each board must consider the disciplinary decisions of all other boards — or all other boards regulating similar professions.  Had the legislature intended such a rigid requirement, it would likely have said so directly.

As we explained in *Lookhart v. State, Division of Corporations, Business, & Professional Licensing*, a board's duty to "seek consistency" is not so exacting.[55] Licensing boards need only take "reasonable, affirmative steps" to seek consistency with prior decisions.[56]  When a case involves novel circumstances with compounding violations, a licensing board "is not obligated to operate strictly within the bounds of existing precedent."[57]  Some flexibility is needed so a board can "adapt to evolving professional standards" and "craft appropriate sanctions in response to novel factual circumstances."[58]  Requiring the licensing board for one profession to seek consistency with the disciplinary decisions of other licensing boards would run counter to these goals, hindering each body from responding appropriately to the distinct standards of

---

[53]    *See Lookhart v. State, Div. of Corps., Bus., & Pro. Licensing, Bd. of Dental Exam'rs*, 548 P.3d 1094, 1098-100 (Alaska 2024) (applying independent judgment to interpret scope of board's duty to seek consistency).

[54]    *Roberge v. ASRC Constr. Holding Co.*, 503 P.3d 102, 104 (Alaska 2022) (quoting *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1121 (Alaska 2017)).

[55]    548 P.3d at 1099.

[56]    *Id.* (quoting *Conille v. Sec'y of Hous. & Urb. Dev.*, 840 F.2d 105, 112-13 & n.12 (1st Cir. 1988)).

[57]    *Id.*

[58]    *Id.* at 1100.

its own profession. A disciplinary board must seek consistency with its own prior disciplinary decisions, not those of other professional licensing boards.

Dr. Shoemaker argues, alternatively, that the Board's decision was not even consistent with its own prior decisions. He points to two cases discussed during the hearing in which chiropractors voluntarily surrendered their licenses while facing charges of felony assault in one case and domestic violence in another. He also describes a "multitude" of cases in which practitioners engaged in inappropriate relationships with patients or staff but did not have their licenses revoked. And he points to a published decision by the Medical Board to suggest the Chiropractic Board's selection of sanction was unreasonable.[59]

Dr. Shoemaker misconstrues the Board's duty. The Board considered and distinguished these cases. It explained that the practitioners in those cases did not exhibit the same wide range of sanctionable conduct in Dr. Shoemaker's case. Because the range of Dr. Shoemaker's misconduct was uniquely broad, and was paired with a disturbing lack of remorse or insight, the Board did not violate its duty to "seek consistency" with prior disciplinary decisions by imposing the most serious sanction on Dr. Shoemaker.

## V.    CONCLUSION

We REVERSE the judgment of the superior court and REMAND for reinstatement of the Board's decision.

---

[59]    The superior court faulted the Board for not considering any decisions by the Medical Board, but the Chiropractic Board did cite and distinguish the Medical Board decision brought to its attention by Dr. Shoemaker.